UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20671-CV-WILLIAMS
MAGISTRATE JUDGE REID

MICHAEL PAUL,

      Petitioner,

v.

MARK S. INCH,[1]

      Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE

### I. Introduction

The Petitioner, **Michael Paul**, has filed this *pro se* petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions for first degree murder and related offenses, entered following a jury verdict in Miami-Dade County Circuit Court, Case No. F05-21793-E. For the reasons detailed below, the Petitioner is not entitled to habeas corpus relief.

This cause has been referred to the undersigned for consideration and report, pursuant to 28 U.S.C. § 636(b)(1)(B), (C); S.D. Fla. Local Rule 1(f) governing

_____

[1]Pursuant to Fed. R. Civ. P. 25(d), since Mark S. Inch has replaced Julie Jones as the Secretary of the Florida Department of Corrections, he is substituted as the proper respondent in this case.

Magistrate Judges; S.D. Fla. Admin. Order 2019-02; and the Rules Governing Habeas Corpus Petitions in the United States District Courts.

For its consideration of the petition [ECF 1], the court has the Respondent's response to this court's order to show cause [ECF 11], along with its supporting appendix [ECF 13; 14], containing copies of relevant state court pleadings, including hearing and trial transcripts.

## II. Claims

Construing the arguments liberally as afforded *pro se* litigants, pursuant to *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Petitioner raises the following grounds for relief:

1. He received ineffective assistance of counsel when his lawyer misadvised him not to testify at trial. [ECF 1, p. 4].

2. He received ineffective assistance of counsel when his lawyer failed to move to dismiss the indictment on double jeopardy grounds. [ECF 1, p. 6].

3. He received ineffective assistance of counsel when his lawyer failed to move for judgment of acquittal at the close of the state's case as to the charge of armed trafficking. [ECF 1, p. 8].

4. He received ineffective assistance of counsel when his lawyer failed to produce evidence to support an independent act jury instruction. [ECF 1, p. 9].

### III. Procedural History

A jury found Petitioner guilty, as set forth in the indictment [ECF 13-3], of first-degree murder (Count 1), armed carjacking (Count 2), kidnapping (Count 3), armed robbery (Count 4), grand theft of a vehicle (Counts 5 & 6), armed burglary (Count 7), armed drug trafficking (Count 10), and conspiracy to traffic cocaine (Count 11). [ECF 13-10]. Petitioner received a life sentence. [ECF 13-12]. Later, the State announced a *nolle prosequi* on Count 5, and the trial court vacated the sentence as to that count only. [ECF 13-13].

On appeal, Petitioner raised multiple issues including, in pertinent part, (I) the trial court erred by denying the defense's request for an independent act instruction; and, (II) the trial court erred by denying his motion to suppress his statement to police. [ECF 13-21]. On August 1, 2012, the Third District Court of Appeal ("Third DCA") *per curiam* affirmed Petitioner's judgment and sentence. [ECF 13-28]; *see also Paul v. State*, 95 So.3d 237 (Fla. 3d DCA 2012) (table).

Petitioner was not permitted to seek discretionary review with the Florida Supreme Court because the affirmance on direct appeal did not cite to any decision for which the Florida Supreme Court had accepted review. *See Wells v. State*, 132 So.3d 1110, 1113 (Fla. 2014). Therefore, Petitioner's conviction became final, and the federal limitations period, under the AEDPA, began running on **October 30, 2012,** ninety days after the state appellate court issued its *per curiam* affirmance,

when the period for seeking discretionary review with the Supreme Court of the United States expired. *See* Sup. Ct. R. 13; *Gonzalez v. Thaler,* 565 U.S. 134 (2012).

**Fifty days later**, on December 19, 2012,[2] Petitioner filed a petition for writ for habeas corpus in the Third DCA, alleging ineffective assistance of appellate counsel. [ECF 13-31, p. 16]. On February 1, 2013, The Third DCA denied Petitioner's motion for rehearing regarding the appellate court's denial of his petition, and the case was disposed of without a mandate. [ECF 13-30].

**One hundred and eighty-two days later**, on August 1, 2013, Petitioner filed a *pro se* motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850. [ECF 13-32, p. 1]. In the motion, Petitioner raised twelve grounds of ineffective assistance of counsel including, in pertinent part, failure to give reasonable advice and allow him to testify at trial on his own behalf (raised as ground 1)[3]; failure to move to the dismiss the information on double jeopardy grounds (raised as ground 4); failure to move to dismiss the charge of armed trafficking (raised as ground 5); and failure to

---

[2] Absent evidence to the contrary, in accordance with the prison mailbox rule, a *pro se* prisoner's filing is deemed filed on the date it is delivered to prison authorities for mailing. *Washington v. United States,* 243 F.3d 1299, 1301 (11th Cir. 2001); Fed. R. App. 4(c)(1). Here, while there is no stamp indicating when Petitioner submitted his petition to authorities for mailing, he signed the petition on December 19, 2012.

[3] This claim is not clearly labeled as "GROUND ONE" in Petitioner's Rule 3.850 Motion, but it is the first claim that he raises before he goes on to address what he labels as "GROUND TWO." [ECF 13-32, p. 7].

produce evidence to support an independent acts jury instruction (raised as ground 11). [ECF 13-32].

The trial court appointed counsel to represent Petitioner. [ECF 14-39, p. 44]. Counsel then field an amended motion for postconviction relief, raising additional grounds not raised in the initial *pro se* motion. [ECF 13-34]. Later, Petitioner, through counsel, struck this amended motion, and proceeded on the initial *pro se* motion. [ECF 14-44, pp. 2-5].

The trial court held an evidentiary hearing on grounds one and eleven, where both Petitioner and his trial counsels testified. [ECF 14-44]. The trial court then entered a detailed written order denying Petitioner's motion on all grounds raised. [ECF 13-36].

Petitioner appealed to the Third DCA, who appointed counsel to represent him on appeal. [ECF 13-37; 13-43]. Appointed counsel then moved to withdraw, and in accordance with *Anders v. California*, 368 U.S. 638 (1967), filed a memorandum brief. [ECF 13-47; 13-48]. The Third DCA allowed Petitioner to submit a statement of any points in support of the appeal. [ECF 13-49]. In accordance with the Third DCA's order, Petitioner filed a brief, challenging the trial court's denial of his claims that (I) counsel was ineffective for misadvising him not to testify; (II) counsel was ineffective for failing to challenge Petitioner's convictions on double jeopardy grounds; (III) counsel was ineffective for failing to adequately argue for judgment

of acquittal on the armed trafficking charge; and (IV) counsel was ineffective for failing to present any evidence to support an independent act jury instruction. [ECF 13-52]. The Third DCA *per curiam* affirmed the trial court's denial of the Rule 3.850 motion, and allowed the public defender to withdraw. [ECF 13-53; 13-54]. The mandate issued on January 30, 2017. [ECF 13-55].

**Eighty-four days later**, on April 24, 2017, Petitioner filed a motion to correct illegal sentence pursuant to Fla. R. Crim. P. 3.800(a). [ECF 13-56, p. 1]. The trial court denied the motion. [ECF 13-58]. The denial was *per curiam* affirmed by the Third DCA on appeal. [ECF 13-61].

Prior to the issuance of the mandate in the above Rule 3.800 proceedings [ECF 13-64], Petitioner filed the instant federal habeas corpus petition. [ECF 1, p. 1].

### IV. Threshold Issues

A. <u>Timeliness</u>

Careful review of the procedural history of this case confirms that less than one year of un-tolled time expired after the Petitioner's judgment became final and the filing of this federal habeas petition. Therefore, as the Respondent correctly concedes [ECF 11, p. 30], the petition is timely filed under 28 U.S.C. § 2244(d).

B. <u>Exhaustion & Procedural Default</u>

Next, the Respondent argues that several of Petitioner's claims are unexhausted and procedurally defaulted from federal habeas review. [ECF 11]. In

addressing the issue of exhaustion and procedural default, the court must determine whether the claims raised here were raised in the state court proceedings, and whether the state courts were alerted to the federal nature of the claims.

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies. See 28 U.S.C. §§ 2254(b), (c). To properly exhaust state remedies, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples,* 489 U.S. 346, 351 (1989); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015).

Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004) (citation omitted). A petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id*. For example, "[A] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin,* 541 U.S. at 32; *McNair v. Campbell,* 416 F.3d 1291, 1302-1303 (11th Cir. 2005).

To circumvent the exhaustion requirement, Petitioner must establish that there is an "absence of available state corrective process" or that "circumstances exist that render such process ineffective to protect [his] rights." 28 U.S.C. § 2254(b)(1)(B); *see Duckworth v. Serrano,* 454 U.S. 1, 3 (1981).

Failure to exhaust a claim can result in a procedural default bar in federal court if it is obvious that the unexhausted claim would now be procedurally barred in state court. *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999). Florida law requires post-conviction petitions alleging ineffective assistance of counsel to be filed within two years of any appellate mandate entered in the initial proceeding. *Moore v. Sec'y, Fla. Dept. of Corr.*, 762 F. App'x 610, 619 (11th Cir. 2019). The federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Id*. at 1303.

However, a procedurally defaulted claim may still be considered if the federal petitioner can demonstrate (1) objective cause for the failure to properly present the claim and actual prejudice from the alleged constitutional violation; or, (2) a fundamental miscarriage of justice. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977); *Tharpe v. Warden,* 898 F.3d 1342, 1344–47 (11th Cir. 2018). Petitioner can show cause by alleging that some objective factor, external to the defense, impeded his effort to raise the claim properly in the state court. *See Murray v. Carrier,* 477 U.S. 478, 488, (1986); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show

prejudice, a petitioner must demonstrate that the "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *See McCoy v. Newsome,* 953 F.2d at 1261 (*quoting Murray v. Carrier,* 477 U.S. at 494). The allegations of cause and prejudice must be factually specific, not conclusory. *Harris v. Comm'r, Ala. Dep't of Corr.,* 874 F.3d 682, 691 (11th Cir. 2017).

In *Martinez v. Ryan,* 566 U.S. 1 (2012), the Supreme Court expanded upon what "cause" may excuse a procedural default, determining that when a state court claim of "ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan,* 566 U.S. at 17. Therefore, relief is available if (1) state procedures make it virtually impossible to actually raise ineffective assistance of trial counsel claims on direct appeal; and (2) the Petitioner's state collateral counsel was ineffective for failing to raise ineffective assistance of trial counsel claims in the state proceedings. *See Lambrix v. Sec'y, Fla. Dep't of Corr.,* 756 F.3d 1246, 1261 n.31 (11th Cir. 2014). To prove that the claim is "substantial," the petitioner must demonstrate that the claim has some merit. *Martinez v. Ryan,* 566 U.S. at 10.

Here, the exhaustion and procedural default issues with each of Petitioner's claims will be addressed individually in the discussion section below.

## V. Statement of Facts

A. <u>Motion to Suppress</u>

Prior to trial, counsel moved to suppress Petitioner's statements to the police. [ECF 13-4]. Specifically, he alleged that months after the crimes had occurred, law enforcement authorities tracked Petitioner to Gainesville, in Alachua County. [*Id*.]. Counsel argued that officers from the Alachua County Sheriff's Office "savagely" beat Petitioner, necessitating medical attention. [*Id*.]. As such, Petitioner's statements to those officers shortly afterward were involuntary and obtained in violation of his *Miranda*[4] rights. [*Id*.].

Prior to a hearing on the motion, the State perpetuated the testimony of Alachua County Deputy Sheriff Mark Litzkow. [ECF 14-3]. Litzkow testified that after the murder, he was aware that City of Miami of police were looking for Petitioner. [*Id*., pp. 8-9]. On July 28, 2009, Litzkow believed that he had located Petitioner at an apartment complex, and notified the special operations deputies. [*Id*., pp. 15-16]. He did not see Petitioner's actual arrest. [*Id*., p. 67], but shortly afterward observed Petitioner with a busted lip and abrasion. Petitioner was not crying or in distress. [*Id*., pp. 45-46].

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

On January 21, 2010, the trial court held a hearing on the motion. [ECF 14-4]. The Court noted that it had reviewed Petitioner's recorded statement to officials. [*Id*., p. 4]. The State also moved to admit the perpetuated testimony of Deputy Litzkow. [*Id*., pp. 16-17].

Officer David Rodriguez testified that he was a member of the SWAT team that arrested Petitioner. [*Id*., p. 70]. Rodriguez could hear officers ordering Petitioner to show his hands and get down on the ground, but could not see them because of where he was standing. [*Id*., pp. 73, 79]. Rodriguez then walked over and placed Petitioner in handcuffs while he was laying flat on the asphalt. [*Id*. pp. 75-76]. Rodriguez saw that Petitioner had a cut on his lip and a little scratch on his face. [*Id*., p. 76]. The SWAT medic examined Petitioner while he was in the back of Rodriguez's patrol car. [*Id*., p. 77]. When fire rescue responded, Petitioner refused medical attention. [*Id*., p. 78].

Sergeant Joshua Cruz testified that he was a member of the SWAT team, and ordered Petitioner to get on the ground. [ECF 14-5, p. 6]. Petitioner, who had a milk container in his hands, got down on all fours, but was still in the crawling position. [*Id*.]. Deputy Holt put his foot on Petitioner's back and pushed him down so that he could get him flat on the ground. [*Id*., p. 7]. As he did this, Petitioner's face struck the milk container and the contents splashed. [*Id*.].

11

Detective Robert Dean testified that when Petitioner was brought to the station, he did not ask for medical attention or cry for help. [ECF 14-5, p. 42].

Detective Freddie Ponce from the Miami Police Department testified that he notified the Alachua County Sheriff that Petitioner was a violent offender wanted for homicide. [ECF 14-4, pp. 36-37]. When the Alachua County Sheriff took Petitioner into custody, Ponce drove straight to Gainesville. [*Id.*, p. 42]. Ponce began to interview Petitioner at 2:39 a.m. in a recorded interview room [*Id.*, pp. 44, 47]. Ponce observed that Petitioner had an injury to his lip, and Petitioner stated that fire rescue had seen him. [*Id.*, p. 46]. Petitioner waived his *Miranda* rights. [*Id.*, pp. 49-50, 66-67]. Ponce also requested a report from the officers involved with Petitioner's apprehension. [*Id.*, p. 54].

Petitioner testified at the suppression hearing. [ECF 14-5, p. 43]. On the date of his arrest, he had milk and an oatmeal pie in his hands. [*Id.*, p. 48]. When officers told him to get on the ground, he complied, laying flat on the ground. [*Id.*]. Officer Rodriguez placed cuffs on him and told Petitioner to "face the ground." [*Id.*, p. 50]. Rodriguez then put his foot on the back on Petitioner's head and smashed his face into the ground, injuring Petitioner's lip. [*Id.*, p. 51]. Rodriguez also kicked him on the side of his back. [*Id.*]. When fire rescue arrived, the EMT told Officer Rodriguez that Petitioner needed stitches, and Rodriguez told her "Nah. Just clean him up, for the mugshot." [*Id.*, p. 55]. At the station, Rodriguez slapped Petitioner on his left

cheek. [*Id.*, p. 58]. When Detective Ponce arrived from Miami, Petitioner felt safe from the Gainesville officers. [*Id.*, p. 61].

The trial court denied the motion to suppress, finding that the SWAT team knew that Petitioner was alleged to have been armed and dangerous, and was wanted by homicide for a burning of a body. [ECF 14-6, p. 6]. When they ordered him to the ground, Petitioner got on all fours; and to gain control of him for their safety, it was necessary to put his body flat on the ground. [*Id.*, pp. 7-8]. The court also found that there was nothing to corroborate Petitioner's statement that he was kicked in the head by Officer Rodriguez, and it was clear that the "officers had to use some type of force because he failed to comply with their rules." [*Id.*, p. 8]. Finally, the court found that there was a sufficient temporal break between the arrest and the interrogation such that Petitioner's statement to police was not involuntary. [*Id.*, p. 9].

B. Trial[5]

The testimony at trial established that Petitioner was a drug dealer. [T. 27, p. 2972, 2974].[6] Jesus Discua, the victim, was Petitioner's drug supplier. [T. 23, p. 2286, 2402]. Petitioner owed Discua several thousand dollars. [T. 2, p. 90].

---

[5] Petitioner and one of his co-defendants, Travis Stubbs, were tried together. The state presented the testimony of multiple witnesses at trial, including Petitioner's co-defendants Myron Morales [T. 30, p. 3195] and Heriberto "Eddie" Huerta. [T. 33, p. 3591].

[6] When referencing the testimony at trial, the Court cites the transcripts provided in the state's appendix [ECF 14].

In June 2005, Petitioner had something big planned. [T. 33, p. 3603]. Petitioner, who had engaged in other drug robberies [T. 33, p. 3601], planned with his co-defendants to steal twenty kilograms of cocaine from Discua. [T. 30, pp. 3203-04]. The co-defendants were Travis Stubbs, a.k.a. Tick, Myron Morales and Heriberto "Eddie" Huerta. [T. 30, p. 3209]. Myron Morales, who did not know the victim, would sell the stolen cocaine for Petitioner through Rene De la Paz. [T. 33, p. 3783].

Petitioner believed Discua had drugs at a stash house [T. 30, p. 3276], which in actuality, was where Discua's girlfriend, Evelina Martinez, and their children lived. [T. 23, p. 2407]. Morales, Huerta, and Petitioner began to prepare for the robbery, surveilling the house. [T. 30, p. 3279; T. 33, p. 3606]. The crime was Petitioner's idea. [T. 33, p. 3781].

On July 1, 2005, Petitioner called Huerta and told him the crime would be committed the next day. [T. 33, p. 3608]. The next day, Petitioner met Morales and De la Paz at a restaurant, and told them to be ready to commit the robbery. [T. 30, p. 3205]. They discussed each man's role. [T. 30, p. 3215; T. 33, pp. 3603, 3607]. Petitioner direct all the co-defendants on where to meet. [T. 30, p. 3217].

Petitioner then called the victim and asked him to meet up. [T. 30, p. 3260]. Phone records show that the only calls made by Petitioner to the victim were by

public pay phones. [*Id.*]. Petitioner was the only one who called the victim. [T. 30, p. 3216].

Morales, Huerta, De la Paz, and Petitioner met in their vehicles at a Honduran restaurant. [T. 30, p. 3214; T. 33, p. 3611]. Petitioner drove his girlfriend's Ford Expedition to the meeting. [T. 23, p. 2547; T. 24, p. 2554; T. 30, p. 3219]. Travis Stubbs was in the vehicle with Petitioner. [T. 30, p. 3219; T. 33, p. 3611]. Petitioner then told Huerta and Morales to go to Walgreens, where they all met. [T. 30, p. 3209; T. 33, p. 3615]. They learned that the robbery was going to be at a BP gas station. [T. 30, pp. 3217-18]. Petitioner and his co-defendants then went to a Wendy's restaurant and waited. [T. 30, p. 3221; T. 33, p. 3617].

Earlier, Petitioner gave Morales a bag, which contained a firearm, a stun gun and wire straps. [T. 30, p. 3210]. Morales placed the bag inside a newspaper vending machine underneath newspapers with the intention of retrieving it later. [T. 30, p. 3210]. Morales later retrieved the firearm and the stun gun, and gave the bag to Petitioner. [T. 30, pp. 3218, 3220]. Huerta saw plastic ties in Petitioner's pocket. [T. 33, p. 3617].

The plan was for the drugs to be inside Discua's car at the gas station. [T. 30, p. 3222]. They then waited for Discua to contact Petitioner. [T. 33, p. 3613]. Petitioner said that they might have to leave with the victim. [T. 33, p. 3614; T. 34, p. 3791]. Morales and Huerta's jobs were to block Discua's vehicle. [T. 33, p. 3779].

15

Stubb's job was to drive Discua's vehicle, and to get the drugs and give them to Morales. [T. 33, p. 3785].

Discua drove up to the BP station in his red Audi. [T. 25, p. 2288; T. 30, p. 3221]. The car had no drugs inside of it. [T. 30, p. 3226]. Discua had parked his other vehicle, a Nissan 350-Z, at his family's house. [T. 23, p. 2408]. Petitioner told Huerta that he was going to have to go up on the guy, which means to pull a gun on him. [T. 33, p. 3780].

Stubbs told Huerta to move faster because Stubbs knew he had to help Petitioner. [T. 33, p. 3618]. Stubbs pushed into Discua's vehicle from the driver's side, while Petitioner entered from the passenger's side. [T. 30, p. 3221-23; T. 33, pp. 3619-20]. Morales saw Petitioner holding a .32 caliber firearm. [T. 30, p. 3364], Huerta parked next to Discua's car, and Morales parked in front. [T. 30, p. 3224; T. 33, p. 3619]. Discua fought back and screamed for help. [T. 33, p. 3620; T. 30, pp. 3223-24]. Huerta than heard a gunshot as he pushed Stubbs's leg into Discua's car, and Discua screamed "Mike shot me!" [T. 33, pp. 3620-22].

Rolle Charles, a witness at the gas station, saw Discua try to get out of the car. [T. 23, pp. 2326, 2342; T. 30, p. 3225; T. 33, p. 3623].  Discua was held by his neck and simultaneously punched. [T. 23, p. 2326; T. 33 p. 3623]. Charles then heard two to three "pow-pow" noises. [T. 23, pp. 2326, 2360].

Stubbs, with Petitioner, drove the Audi to the back of the gas station. [T. 30, p. 3225; T. 33, p. 3622]. Discua stuck his head outside the passenger side window and tried to climb out. [T. 33, p. 3623]. Once stopped, Huerta saw Petitioner hitting something in the front passenger seat. [*Id.*]. Petitioner exited the car and began to wave his gun. [T. 33, p. 3625].

Morales heard two gunshots, and saw Petitioner holding the gun when it fired. [T. 30, p. 3226, p. 3271]. Stubbs held the stun gun. [T. 30, p. 3227; T. 33, p. 3618]. Huerta also saw Petitioner, who had blood on his shirt, standing in the middle of the street holding a gun in his hand. [T. 33, pp. 3624-25].

Discua called his family; he sounded desperate, anxious, and was crying. [T. 23, p. 2291]. Someone in the background said, "Mike, do not do that to Jesus." [T. 23, p. 2292]. Morales believed he was the one who said this. [T. 30, p. 3227]. Discua told his mother to give the men his Nissan 350-Z parked at the house or else they were going to kill him. [T. 23, p. 2289, 2297; T. 24, p. 2469]. Discua said that the men were killing him, and asked "why are you beating me?" [T. 23, p. 2291; T. 24, p. 2492]. Discua's girlfriend, Evelina Martinez, received a call from Discua's phone. [T. 23, p. 2420]. The caller demanded the Nissan 350-Z or else he would kill Discua. [T. 23, p. 2420]. Discua said, "Baby, just give them the car." [T. 23, p. 2420].

Charles saw the red Audi followed by a white Chevy truck, and gave the truck's license plate number to the 911 operator. [T. 23, pp. 2327-28, 2345; T. 25, p. 2635]. The license plate number came back registered to Morales's relative. [T. 25, pp. 2731-32].

Elvia Hernandez, Discua's sister, saw three men work the locks on the gate of the family home. [T. 23, p. 2295]. One of the men jumped the fence, threw a rock at the parked Nissan 350-Z, and approached the home's front door. [T. 23, p. 2295]. Hernandez activated the house's panic alarm, and the man fled in the direction from which he came. [T. 23, p. 2296].

Discua's mother and brother-in-law pushed the Nissan 350-Z outside the gate into the street, and left the keys on the car's roof. [T. 23, pp. 2297, 2422; T. 24, p. 2476]. After a few minutes, three vehicles arrived at the house. [T. 23, pp. 2298, 2423; T. 24, p. 2476]. Several men approached the car, but were unable to move it. [T. 23, p. 2298, 2424; T. 24, p. 2493]. They left, but soon returned, starting the car and driving away with it. [T. 23, pp. 2299, 2425]. A drug dog later alerted on the car. [T. 31, p. 3530].

In the early morning hours of July 3rd, police found Discua's red Audi burnt and still smoldering. [T. 24, pp. 2511, 2512, 2514]. The car and Discua's corpse (which was later identified) were charred. [T. 24, p. 2514; T. 25, p. 2669; T. 34, p. 3821]. A plastic tie, commonly used by police to bind hands, was found under

Discua's corpse, and it appeared as if accelerant had been used. [T. 25, p. 2701-02; T. 24, p. 2518].

Medical Examiner Emma Lew identified Discua as the victim through dental records. [T. 34, pp. 3836-37]. Discua was shot in the face and left arm. [T. 34, p. 3839]. His face was not identifiable. [T. 34, p. 3834]. His humerus was fractured and his testicles were injured. [T. 34, p. 3842, 3846]. The bullet recovered from Discua's arm, and his wounds, were consistent with .32 caliber ammunition. [T. 34, pp. 3846-47, p. 3862]. The manner of death was homicide caused by a gunshot to Discua's carotid artery. [T. 34, p. 3871].

The day after the murder, Petitioner called Huerta and the two met. [T. 33, pp. 3628-29]. Petitioner wore the same bloody clothes from the day before, so Huerta bought Petitioner clothes at Walgreens, and Petitioner threw his old clothes into a dumpster. [T. 33, p. 3764]. The two then rode around looking for Stubbs and Morales because Petitioner wanted his share of the stolen drugs. [T. 33, pp. 3629-30]. Petitioner told Huerta that Discua was dead. [T. 33, p. 3634]. Someone went to Stubbs's girlfriend's house and banged on the door repeatedly. [T. 31, p. 3462; T. 33, p. 3630]. Petitioner also called Stubbs repeatedly. [T. 33, p. 3683]. Petitioner then went into the house where Stubbs was located and came out carrying a brown paper bag, containing approximately a kilogram of cocaine. [T. 33, pp. 3630-33].

The drugs were worth between $22,000 and $23,000. [T. 34, p. 3794]. Petitioner offered Huerta some of the drugs. [T. 33, p. 3633].

Petitioner had left his girlfriend's Expedition at the BP gas station. [T. 25, p. 2630]. Petitioner then called his girlfriend's mother and lied to her that the Expedition had overheated and that was why he had left it at a convenience store. [T. 24, pp. 2577, 2581; T. 25, p. 2632]. Petitioner left town, and had no contact with Huerta for approximately five months. [T. 33, pp. 3634-35]. Six months after the murder, Petitioner called his girlfriend and told her that he was sorry about what had happened to the Expedition. [T. 24, p. 2572].

According to Petitioner's videotaped interview with police, he had originally planned to "rip-off" someone named Chele. [T. 27, p. 2973]. However, Petitioner switched his target to Discua, his drug supplier. [T. 27, p. 2979]. Petitioner was a drug supplier for Stubbs and Morales. [T. 27, pp. 2972, 2974].

Petitioner told police that he first drove his girlfriend's Expedition. [T. 27, p. 2980]. After the incident at the gas station, Petitioner got into Discua's Audi, which was driven by Stubbs. [T. 27, p. 2982]. Petitioner claimed that it was only going to be a "rip-off" and that he was going to drive. [T. 27, p. 2982]. Stubbs lets Petitioner off in North Miami. [T. 27, p. 2982]. Petitioner looked for Stubbs the rest of the night because he wanted to get the drugs. [T. 27, p. 2983].  Petitioner went to Stubbs's girlfriend's house looking for him. [T. 27, p. 2983]. Huerta bought

20

Petitioner new clothes because his were bloody. [T. 27, p. 2985]. Petitioner was not surprised Discua was murdered. [T. 27, p. 2984]. A few days later, Petitioner met with Stubbs and got his share of the stolen drugs. [T. 27, pp. 2984-85].

Petitioner never told police that Discua was armed. [T. 27, p. 2982[. He admitted shooting Discua, but later retracted his admission. [T. 27, p. 2986]. He said that plastic ties were used to contain Discua. [T. 28, p. 3014]. Petitioner said that Stubbs carried the gun, the stun gun, and drove Discua's car. [T. 27, p. 2981]. Petitioner admitted to meeting with all the participants separately. [T. 27, p. 2980].

C. Evidentiary Hearing

As previously discussed, the trial court held an evidentiary hearing on grounds one and eleven of Petitioner's motion for postconviction relief. [T. 44, p. 1].

Harvey Watnick, one of Petitioner's trial attorneys, testified that he aware that Petitioner gave a lengthy statement to police after his arrest. [T. 44, pp. 14-15]. Watnick filed the motion to suppress the statement, but anticipated that the trial court would deny it. [T. 44, p. 15]. Watnick also explained that after the court denied the motion, Watnick and Zenobi, Petitioner's other lawyer, knew they were going to have work around the statement to fashion a theory of defense. [T. 44, pp. 15-16]. The theory became that Petitioner was not responsible for Discua's death because the death was a result of an independent act of one of the co-defendants. [T. 44, pp. 15-16].

Watnick discussed the independent act defense with Petitioner. [T. 44, p. 16]. Watnick believed that an independent act instruction was important, but not necessary to proceed with the independent act theory of defense. [T. 44, pp. 17-18]. According to Watnick, the defense believed that there was enough evidence, based on Petitioner's statement to police, to get the independent act instruction. [T. 44, pp. 18-19]. However, in the event that the trial court denied the request for the instruction, Watnick acknowledged that he was not precluded from arguing his independent act defense in closing. [T. 44, p. 81].

Prior to the motion to suppress, Watnick and Zenobi prepared Petitioner to testify. [T. 44, p. 67]. Despite their efforts, however, Watnick felt that Petitioner did not testify well at the motion hearing, and was "a little more than argumentative" with the prosecutor on cross-examination. [T. 44, p. 68]. He characterized his testimony as a "disaster" that did not help counsel's argument. [T. 44, p. 70].

After the trial court denied the motion to suppress, Watnick discussed the possibility of Petitioner testifying at trial. [T. 44, p. 24]. Even though Petitioner admitted to shooting Discua in his recorded statement, Watnick believed that he did so only because he did not understand the detective's questions. [T. 44, p. 22]. Watnick agreed that this statement was a problem for the independent act defense. [T. 44, pp. 24-25]. In Petitioner's statement, he also admitted to tying Discua's hands together. [T. 44, p. 27]. Petitioner told Watnick that he did this because he was afraid

22

that Tic (Stubbs) would turn the gun on him. [*Id*.]. Watnick agreed that the only way to explain these problematic statements was for Petitioner to testify at trial. [T. 44, p. 28].

However, in Watnick's opinion, Petitioner's testimony at trial would not have improved the circumstances of the case given his testimony at the motion to suppress. [T. 44, p. 82]. Zenobi and Watnick spoke with Petitioner about their reservations, but ultimately, it was Petitioner's decision not to testify. [T. 44, p. 83].

After the court denied the request for an independent act instruction at trial, the court colloquied Petitioner on his decision not to testify. [T. 44, p. 30]. Watnick testified that he did not have confidence in Petitioner's ability to take the stand and explain the issues with his statement to police given his testimony at the motion to suppress. [T. 44, p. 33]. However, Watnick did not believe that the defense team specifically consulted with Petitioner after the court denied his request for an independent act jury instruction. [T. 44, pp. 37-38].

On cross-examination, Watnick agreed with the prosecutor's recitation of the evidence presented at trial, including the testimony of Petitioner co-defendants that he was the one who came up with the plan to rob and kidnap Discua. [T. 44, pp. 46-50]. Moreover, Petitioner sought out Stubbs to retrieve his share of the cocaine after the murder had already occurred. [T. 44, pp. 55-56, 62]. Watnick agreed that it would be reasonably foreseeable that someone would get killed as a result of a kidnapping

with a gun. [T. 44, p. 64]. Watnick also agreed that if Petitioner testified, the jury may have prejudged him based on his record. [T. 44, pp. 65-66].

Eugene Zenobi, Petitioner's other trial counsel, testified that he and Watnick knew they would have to explain Petitioner's statement to police, and that they planned on presenting an independent act defense and asking for the independent act jury instruction. [T. 44, pp. 101-03]. When asked if either he or Watnick discussed the idea of testifying with Petitioner after the court denied the request for the instruction, Zenobi's recollection was vague. [T. 44, p. 104]. He did, however, state that Watnick discussed Petitioner's right to testify in a detailed and completed manner. [*Id*.].

On cross-examination, Zenobi stated that he believed that Petitioner came off as "disingenuous" during the motion to suppress, and that he and Watnick had concerns about his demeanor on the stand. [T. 44, pp. 109-10]. As such, Zenobi testified that it was a strategic decision to argue away the ambiguities in Petitioner's statement to police during closing argument, rather than have Petitioner take the stand to explain them himself. [T. 44, pp. 113, 115]. Zenobi, who gave the closing argument, also stated that he told the jury at least four of five times that Petitioner never had the gun and did not shoot Discua, consistent with his statement to police. [T. 44, pp. 114-15]. Zenobi recalled that the trial court conducted a thorough colloquy with Petitioner about whether he wished to testify. [T. 44, p. 27].

24

Petitioner testified as the defense's final witness. [T. 44, p. 118]. He testified that his lawyers did not prepare him prior to the motion to suppress hearing. [T. 44, p. 122]. He stated that his lawyers advised him not to testify at trial, and that his testimony "wasn't needed." [T. 44, pp. 122-23]. His lawyers did not talk about what impact his lack of testimony could have on the jury instructions in the case. [T. 44, p. 123].

After this point, the State objected to Petitioner's testimony as to what he would have testified to at trial, and the circumstances surrounding his participation in the crime. [T. 44, pp. 124-135]. The judge allowed defense counsel to proffer what Petitioner's testimony would have been, and defense counsel stated that Petitioner would have testified consistently with his statement to the police, would have clarified any ambiguities about whether he shot the victim, and would have stated that he only tied Discua's hands because Stubbs forced him to do so. [T. 44, pp. 134-35]. The judge found that this proffered testimony was irrelevant, and informed counsel that he could only go into Petitioner's allegations of misadvice regarding his right to testify. [T. 44, p. 137]. Petitioner testified that he did not know anything about jury instructions and did not know what impact his lack of testimony would have on the jury instructions. [T. 44, p. 138].

On cross-examination, Petitioner admitted that he misunderstood questions when he was being cross-examined at the motion to suppress hearing. [T. 44, p. 148].

25

Petitioner's lawyers never told him that he did a bad job at the hearing, but they did tell him that it was his choice whether or not to testify at trial. [*Id*.]. Petitioner acknowledged that he would have had to admit several bad facts had he testified at trial, including the fact that he attempted to rob someone else. [T. 44, pp. 149-52]. Petitioner initially denied that Stubbs gave him a kilo of cocaine after the crimes, but admitted it when confronted with his statement to police. [T. 44, pp. 155-56].

Although at trial, the court conducted a colloquy regarding Petitioner's right to testify, Petitioner stated that his lawyers told him to say "yes" to all of the judge's questions during the colloquy. [T. 44, p. 160]. On redirect, Petitioner stated that the jury never heard him clear up the ambiguities in his statements to police. [T. 44, p. 162]. In pertinent part, he would have testified that he did not shoot Discua, and that he tied up his hands because he was afraid of Stubbs. [*Id*.].

## VI.   Governing Legal Principles

A. Standard of Review

The court's review of a state prisoner's federal habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Abdul–Kabir v. Quarterman,* 530 U.S. 233, 246 (2007); *Ledford v. Warden, Ga. Diagnostic & Classification Prison,* 818 F.3d 600, 642 (11th Cir. 2016), *cert. den'd,* 137 S. Ct. 1432 (2017). AEDPA ensures that federal habeas corpus relief works to "guard against extreme malfunctions in the state criminal justice systems, and not as

26

a means of error correction." *See Greene v. Fisher,* 565 U.S. 34, 38 (2011). This standard is both mandatory and difficult to meet. *White v. Woodall,* 572 U.S. 415, 420 (2014).

Deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170, 182 (2011); *Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th Cir. 2011). To review a federal habeas corpus claim, the district court must first identify the last state court decision, if any, that adjudicated the merits of the claim. *See Marshall v. Sec'y, Fla. Dep't of Corr.,* 828 F.3d 1277, 1285 (11th Cir. 2016). The state court is not required to issue an opinion explaining its rationale, because even the summary rejection of a claim, without explanation, qualifies as an adjudication on the merits that warrants deference. *See Harrington v. Richter,* 562 U.S. 86, 100 (2011); *Ferguson v. Culliver,* 527 F.3d 1144, 1146 (11th Cir. 2008). Where the state court's adjudication on the merits is unaccompanied by an explanation, federal courts must "look through the unexplained decision to the last related state-court decision that does provide a rationale" and, "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018). Thus, if the relevant state-court decision on the merits is not accompanied by a reasoned opinion, because it was summarily affirmed or denied,

a federal court "should 'look through' the unexplained decision to the last state-court decision that does provide a relevant rationale." *Id.*

Where the claim was "adjudicated on the merits," in the state forum, § 2254(d) prohibits re-litigation of the claim unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or, (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter,* 562 U.S. at 97-98.

A state court decision is "contrary to" established Supreme Court precedent when it (1) applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law is different from an incorrect application of federal law. *Williams v. Taylor*, 529 U.S. at 410. Consequently, "[a] state court's determination that a claim lacks merit precludes federal habeas corpus relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003); *Tharpe v. Warden,* 834 F.3d 1323, 1337 (11th Cir. 2016), *cert. den'd,* 137 S. Ct. 2298 (2017) (accord). In other words, if the last state court to decide a

28

prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers,* 138 S. Ct. at 1192. As applied here, to the extent Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

B. Ineffective Assistance of Counsel Standard

Here, Petitioner raises multiple claims challenging counsel's effectiveness. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *Strickland v. Washington,* 466 U.S. 668, 684–85 (1984). When assessing counsel's performance under *Strickland,* the court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. A § 2254 Petitioner must provide factual support for his contentions regarding counsel's performance. *Smith v. White,* 815 F.2d 1401, 1406–7 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d 1320, 1333–34 (11th Cir. 2012).

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow,* 571 U.S. 12, 20 (2013). "Where the highly deferential standards mandated by *Strickland* and the

AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt,* 735 F.3d 1311, 1323 (11th Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was deficient, falling below an objective standard of reasonableness; and, (2) he suffered prejudice resulting from that deficiency. *Strickland,* 466 U.S. at 687-88. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Strickland* at 690-91. To uphold a lawyer's strategy, a court need not attempt to divine the lawyer's mental processes underlying the strategy, because there are "countless ways to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689.

To establish deficient performance, the movant must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *Strickland, supra. See also Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States,* 218 F.3d at 1313; *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel is not ineffective for failing to raise

non-meritorious issues. *Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001).
Counsel is also not required to present every non-frivolous argument. *Dell v. United
States,* 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, the Supreme Court has explained "[t]he
defendant must show that there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been different."
*Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to
undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. A court need
not address both prongs of *Strickland* if the defendant makes an insufficient showing
on one of the prongs. *Strickland,* 466 U.S. at 697. *See also Brown v. United States,*
720 F.3d 1316, 1326 (11th Cir. 2013).

## VII.   Discussion

In **claim 1**, Petitioner alleges that he received ineffective assistance of counsel
where his lawyers misadvised him not to testify at trial. [ECF 1, p. 4]. Petitioner
claims that he told his counsel that he wanted to testify at trial to clarify the statement
he made to police, and to refute the testimony of Morales and Huerta. [*Id.*]. In
advising Petitioner not to testify, counsel ineffectively failed to advise him that if he
did not "refute allegations that he was an aider, abettor, inciter, or active participant"
in the incident, then he was a principal actor, guilty of all crimes charged under Fla.
Stat. § 777.011 (referred to here as **claim 1a**). [*Id.*, p. 5]. He also claims that his

31

testimony would have supported an independent act instruction. (referred to here as **claim 1b**).[7] [*Id.*]. Petitioner claims that he exhausted this claim by raising it in his Rule 3.850 motion for postconviction relief. [*Id.*, p. 6].

The Respondent argues that **claim 1a** is unexhausted. [ECF 11, p. 36]. In the first ground of Petitioner's Rule 3.850 motion, he raised both claims 1a and 1b. [ECF 13-32, pp. 7-9]. Appellate counsel did not raise either issue when she filed the *Anders* brief. [ECF 13-48]. Petitioner then filed his own brief, alleging only that the trial court erred by denying claim 1b --- that counsel was ineffective for misadvising him not to testify where his testimony would have supported an independent act instruction. [ECF 13-52, pp. 10-14]. He did not, however, argue claim 1b --- that the trial court erred by denying his claim that counsel was ineffective for misadvising him not to testify where his testimony would have established that he was not a principal actor in the crime. [*Id.*]. As such, **claim 1a** here is unexhausted as it was not fairly presented on appeal. *Castille v. Peoples,* 489 U.S. at 351. Moreover, **claim 1a** would now be procedurally barred if raised in state forum because Petitioner has already completed a direct appeal and a Rule 3.850 motion. *Bailey v. Nagle,* 172 F.3d at 1302-03.

---

[7] The Respondent argues that Petitioner raises a third sub-claim within claim 1--- that his testimony would have established reasonable doubt. [ECF 11, p. 36]. Upon review of the petition, the Court does not view this as a separate sub-claim. Essentially, Petitioner's reasonable doubt argument [ECF 1, p. 5] is inextricably intertwined with his argument in both claims 1a and 1b to the extent that he asserts that his testimony would have affected the outcome at trial.

Here, Petitioner makes no showing of cause and prejudice to excuse the procedural default of **claim 1a** raised in the instant petition. To the extent that Petitioner means to allege, in objections or otherwise, that he can rely on *Martinez v. Ryan* to circumvent the procedural default of his claim, such a claim is without merit. *Martinez* does not apply to appeals of collateral proceedings in state court. *See Baker v. Dep't of Corr.*, 634 F. App'x 689, 693 (11th Cir. 2015) (citing *Martinez*, 566 U.S. at 16). Given the foregoing, **claim 1a** is procedurally defaulted from federal review. **Claim 1b**, however, is properly exhausted as it was presented to the Third DCA on appeal. [ECF 13-52, pp. 10-14].

The Third DCA *per curiam* affirmed the trial court's denial of Petitioner's Rule 3.850 motion without written opinion. [ECF 13-53]. Looking through, in accordance with *Wilson v. Sellers,* 138 S. Ct. at 1192, the trial court stated the following in its order denying Petitioner's Rule 3.850 motion after the evidentiary hearing:

> Defendant contends that counsel failed to inform him that if he did not testify at trial that he was not part of a plan, scheme or conspiracy to commit a crime, or alternatively if the evidence showed that he was an aider, abettor, inciter, or active participant the jury could find he was a principal and could be found guilty at trial, guilty of all crimes charged. While the heading leads one to believe Defendant testified, he did not.
>
> At the Post-Conviction evidentiary hearing, Defendant first called Harvey Watnick, one of his defense attorneys. Mr. Watnick testified that the Defendant gave a lengthy statement when he was arrested that was problematic. He tried to get the statement suppressed but the motion was denied after the suppression hearing.

Mr. Watnick testified that he expected that the statement would not be suppressed and that the theory of defense was built around that belief. The defense at trial was that the Defendant was not responsible for the death in this case, but that there was an act by a co-defendant that was unanticipated. In essence, there was an independent act by another person. This was discussed at length with the Defendant. The strategy was to impeach the witnesses who [had] originally been co-defendants.

Mr. Watnick was aware that there was a jury instruction on independent acts. He thought he could argue the defense without the instruction, however, if the instruction was given by the court if would have greatly aided the theory of defense. It would have emphasized that the Defendant's plan did not include guns or violence. He discussed the problem with the inference from the statement that the Defendant shot the victim, Jesus Discua.

After the Defendant testified in the suppression hearing, Mr. Watnick did not have any confidence in the Defendant's ability to testify at trial and withstand cross-examination taking the stand in his own defense at trial. Mr. Watnick discussed with the Defendant the advantages and disadvantages of his taking the stand. Mr. Watnick was shown pages 3319-3326 of the trial transcript, which were introduced into evidence during the hearing. He testified that he might not have had the conversation with the Defendant between pages 3319-3326 of the trial transcript, but was certain the conversation occurred. At the hearing the pages were given to Mr. Watnick. Mr. Watnick and co-counsel, Eugene Zenobi testified they did have the conversation with the Defendant testifying at trial just not at that point. The conversation took place prior to that. Mr. Watnick testified it was a considered decision based on the pros and cons of Defendant's testifying. Everyone on the defense team, including the Defendant, agreed the Defendant would not testify at trial. Mr. Watnick believed based upon the Defendant's statement to the police and his previous testimony at the suppression hearing, testifying at trial would not assist in the defense. Ms. Levine was powerful with the Defendant when she cross-examined him during the suppression hearing. According to Mr. Watnick, the Defendant gave up easily when confronted with facts. He was defensive, argumentative, and inconsistent in his testimony. Mr. Watnick believed the Defendant's testimony was a disaster. He did not think the Defendant could handle further cross-examination at trial.

During cross-examination, Mr. Watnick testified that it is foreseeable for someone to get killed in a drug ripoff, thereby vitiating the independent act theory of defense.

When questioned about the Defendant's statement, Mr. Watnick confirmed that the Defendant stated he did not shoot the victim. "Me & Jesus straight" (p. 311 statement of Defendant to officers, which was introduced into evidence at the hearing.) According to his statement to police, the gun was in co-defendant Travis Stubbs' (Tic) hand.

Mr. Watnick told the Defendant it was solely his decision whether or not to testify. They had weighed the advantages and disadvantages of the Defendant taking the stand. They believed there was no benefit to the Defendant taking the stand. It was a tactical decision.

Eugene Zenobi, who was co-counsel for Defendant, also testified. He said that the biggest problem for the defense was the fact that the co-defendants' were flipping right up to trial and testifying.

Mr. Zenobi stated that the Defendant was prepped for his testimony in the suppression hearing. He was not told what to say, but he was assisted in using proper verbiage. Assistant State Attorney, Ms. Levine's cross-examinations were withering and the Defendant appeared disingenuous. Mr. Zenobi testified that he did the voir dire himself, to address issues of how a Defendant may appear nervous or disingenuous while testifying.

Mr. Zenobi also testified that Mr. Watnick explained things, including the right to testify so patiently and thoroughly that Mr. Zenobi only said something if he disagreed. He said he was impressed with how well Mr. Watnick explained the issue of testifying on his own behalf to the Defendant.

Defense counsel proffered that had Defendant testified at trial, he would have testified consistently with his statement subject to cross-examination by Ms. Levine. See Exhibit 1, attached. He would have clarified that he did not shoot Jesus in the arm, that he misheard Det. Ponce's question. He would have clarified that he tied up Jesus, but he did so because Stubbs told him to, that Stubbs had a gun and the Defendant was afraid for his life.

The Defendant also testified at the Post-Conviction hearing. He has 9 felony convictions, including this case. He said there was a conversation about whether or not to testify. The attorneys told him his testimony was not needed, but did not tell him why. He took their advice. He said that his attorneys never told him he did not do well on the stand during the suppression hearing. They did tell him he could testify or not and that the decision was his. He admitted during cross-examination that a number of things could come out during his testimony that would reflect negatively for him in that he did drug rip offs while on probation, planned numerous times to rip off the victim, and lied to police.

The Defendant's testimony was not credible. During cross-examination, he was squirming in his seat. His body language became defensive. His demeanor changed. The tone in which he answered questions took on a hostile or belligerent tone. In short, everything his attorneys feared would happen if he testified on his own behalf at trial, occurred at the Post-Conviction hearing. Moreover, this was a limited cross-examination only on the grounds to which an evidentiary hearing was granted.

Even if he did testify consistently with his proffer, Defendant's statement does not make sense. According to his statement, Stubbs held a gun to the Defendant's head and he was in fear for his life. Yet he went looking for Stubbs after Stubbs dropped him off in North Miami. Clearly, most people would be running as far and as fast as they could from someone they feared after having a gun held to their head. They would not repeatedly go looking for someone if they were truly afraid of that individual.

In contrast, both attorneys testified credibly and consistently with each other.

The claim is denied.

[ECF 13-36, pp. 2-5].

The law is clear that a defendant has a constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987). That right is personal and

fundamental; it cannot be waived by either the court or trial counsel, but only by the defendant. *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992). Indeed, the defendant is the one "who above all others may be in a position to meet the prosecution's case." *Ferguson v. Georgia*, 365 U.S. 570, 582 (1961).

Counsel gives ineffective assistance with respect to the defendant's right to testify where he or she "has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone." *Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999). Moreover, a lawyer who advises a client not to testify for tactical reasons does not provide ineffective assistance. *Lee v. Murphy,* 41 F.3d 311, 314 (7th Cir. 1994). "[I]f counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." *Teague*, 953 F.2d at 1533.

Under Florida law, the independent act doctrine applies "when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, 'which fall outside of, and are foreign to, the common design of the original collaboration.'" *Ray v. State*, 755 So.2d 604, 609 (Fla. 2000) (*quoting Ward v. State*, 568 So.2d 452, 453 (Fla. 3d DCA 1990)). Under these limited circumstances, "a defendant whose cofelon exceeds the scope of the original

plan is exonerated from any punishment imposed as a result of the independent act." *Id*.

Here, Petitioner fails to provide clear and convincing evidence to rebut the trial court's finding regarding the credibility of the witnesses at the evidentiary hearing. *See Nejad v. Att'y Gen. Ga.* 830 F. 3d 1280, 1292 (11th Cir. 2005). It appears that the trial court took great care in examining the testimony presented at the lengthy evidentiary hearing, and its finding that Petitioner's testimony was not credible was well within its province. *See Nejad*, 830 F. 3d at 1292 (citing *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011)). The trial court also reasonably found that Watnick and Zenobi's made a tactical decision for Petitioner not to testify, and that Petitioner voluntarily chose not to testify after being advised that it was his fundamental right, regardless of his attorneys' advice. [ECF 13-36, pp. 2-5].

Moreover, Petitioner's proffered testimony here essentially amounts to an incredible denial of the entire incident, including that (1) his plan to steal Discua's cocaine was abandoned; (2) his plan did not involve violence or force; (3) Stubbs, Morales, and Huerta, and others acted on their own accord in an independent action; (4) what took place inside of the red Audi was not what Morales and Huerta claimed to see; and, (5) he did not beat, kidnap, rob, steal or kill or receive any amount of cocaine from anyone and did not offer any cocaine to Huerta. [ECF 1, p. 5]. This

proffered testimony was wholly contradicted by the testimony presented at trial, and consequently, would not have supported an independent act instruction, as Petitioner now claims.

Specifically, under Florida law, an independent act instruction is appropriate only when a cofelon undertakes *unforeseeable acts* outside the scope of the original plan. *See Rodriguez v. State*, 147 So.3d 1066, 1068 (Fla. 3d DCA 2014). Here, there was more than sufficient evidence presented to show that Discua's murder was a foreseeable consequence of Petitioner's plan to rob Discua of his cocaine. In pertinent part, the evidence showed that Petitioner and Morales began planning the drug robbery [T. 30, pp. 3207, 3276-77], and that prior to the actual incident, Petitioner gave Morales a firearm. [T. 30, pp. 3210, 3218, 3220]. Petitioner also told Huerta that he was going to have to go up on the guy [T. 33, p. 3780], and Morales actually saw Petitioner holding a firearm during the incident [T. 30, p. 3364]. Huerta then heard a gunshot, with Discua screaming "Mike [Petitioner] shot me!" [T. 33, pp. 3260-22]. After the murder, Petitioner called Huerta and the two went to find Stubbs to collect Petitioner's share of the cocaine recovered from the robbery. [T. 33, pp. 3269-33].

Petitioner's proffered testimony is also entirely contradicted by his testimony at the postconviction hearing and his statement to police after his arrest. In pertinent part, Petitioner acknowledged at the evidentiary hearing that he would have had to

admit several bad facts had he testified at trial, including the fact that he admitted that he attempted to rob someone else in his statement to police. [T. 44, pp. 149-52]. Moreover, although Petitioner initially denied that Stubbs gave him a kilo of cocaine after the crimes, he admitted it when confronted with his statement. [T. 44, pp. 155-56]. Given Petitioner's sworn testimony at the evidentiary hearing, his proffered testimony here is completely incredible, and potentially perjurious.

It is clear from review of relevant record that after the trial court denied the motion to suppress, his trial attorneys were limited in creating their theory of defense given Petitioner's admissions to police. Although the trial court denied the request for an independent act instruction, counsel continued to argue the independent act theory in closing [T. 44, pp. 41, 79, 81-82], and reasonably believed that Petitioner's trial testimony would have been detrimental to the defense [T. 44, pp. 31-32, 38, 67-73, 109-110]. Advising Petitioner not to testify in this situation does not constitute deficient performance under the first prong of *Strickland*. *See Teague*, 953 F.2d at 1533.

Moreover, even if Petitioner had testified at trial, his testimony would have been entirely discredited by the prosecution in light of his previous contradictory statements to the court and law enforcement. In light of the overwhelming evidence presented at trial, there is no reasonable probability that Petitioner would have been

acquitted had he testified. As such, Petitioner fails to demonstrate prejudice under the second prong of *Strickland*.

Given the foregoing, the state court's denial of **claim 1b** was not contrary to federal law and did not render Petitioner's trial fundamentally unfair. Accordingly, the State court's rejection of this claim should not be disturbed here. *Williams v. Taylor*, *supra*. **Claim 1** should be denied.

In **claim 2**, Petitioner alleges that counsel was ineffective when he failed to move to dismiss the information charging armed carjacking, armed robbery, and grand theft auto of the same car, in the same episode, on double jeopardy grounds. [ECF 1, p. 6]. The Respondent argues that this claim is unexhausted and procedurally defaulted from federal review. [ECF 11, p. 54].

Review of the record reveals that Petitioner raised this ineffective assistance of counsel claim in his Rule 3.850 motion for postconviction relief. [ECF 13-32, p. 13]. The trial court denied the claim as procedurally barred, stating that double jeopardy violations could have and should have been raised on direct appeal. [ECF 13-36, p. 6] (citing *Maharaj v. State*, 684 So.2d 726, 728 (Fla. 1996). Petitioner raised this claim in his *pro se* brief on appeal, arguing that his claim was not procedurally barred because ineffective assistance of counsel claims are appropriately brought under Rule 3.850. [ECF 13-52, pp. 14-17]. The Third DCA

*per curiam* affirmed the trial court's denial of the motion without any indication that the claim was considered on the merits. [ECF 13-53].

Because the procedural bar issues associated with this claim are complicated, the Court will evaluate Petitioner's claim under *de novo* review standard. *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014); *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109-10 (11th Cir. 2012).

As an initial matter, Petitioner's 2010 judgment reveals that he was convicted of two counts of grand theft (Counts 5 and 6). [ECF 13-12, p. 2]. On Count 6, he was sentenced to five years in prison [*Id.*, p. 6]. After the original judgment was entered, the state filed announced a *nolle prosequi* on Count 5, and the trial court vacated his conviction and sentence as to that count. [ECF 13-13]. Petitioner's five-year sentence on count 6 expired prior to the filing of the instant case. [*Id.*, p. 9] (noting that Petitioner's sentence on Count 6 was to run concurrent to the sentence imposed on Counts 1 through 5). Thus, to the extent that Petitioner challenges his convictions for grand theft on double jeopardy grounds, he fails to meet the "in custody" requirement for the Court to retain jurisdiction over these counts. *Maleng v. Cook*, 400 U.S. 488, 490-91 (1989). Nevertheless, in an abundance of caution, the Court considers Petitioner's double jeopardy argument as to these counts below.

42

The Fifth Amendment to the United States Constitution guarantees that no person "shall be subject for the same offense to be twice put in jeopardy of life or limb," U.S. Const. amend. V, and applies to the states through the Fourteenth Amendment, *e.g., Benton v. Maryland*, 395 U.S. 784, 787 (1969). The guarantee protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

Generally, "[t]he question under the Double Jeopardy Clause whether punishments are multiple is essentially one of legislative intent." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) (internal quotations omitted). Absent a clear indication of contrary legislative intent, the courts apply the "same-elements" test of *Blockburger v. United States*, 284 U.S. 299 (1932), to determine whether a single criminal incident may be cumulatively punished under separate statutory provisions. The same-elements test inquires whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution. *Id*. at 304.

In Florida, separate convictions for different offenses arising from a single act are only permissible where each separate offense contains an element that the other lacks. *See* Fla. Stat. § 775.021(4)(a),(b). "The proper analysis to determine whether offenses arise from the same criminal episode requires consideration of the following factors: 1) whether separate victims are involved; 2) whether the crimes

43

occurred in separate locations, and 3) whether there has been a temporal break between the incidents." *Russo v. State*, 804 So.2d 419, 420-21 (Fla. 4th DCA 2001) (*quoting Vasquez v. State*, 778 So.2d 1068, 1070 (Fla. 5th DCA 2001)).

Here, the indictment charged Petitioner with armed carjacking (Count 2) for acting in concert with his co-defendants to "unlawfully, by force, violence, assault, or putting in fear," take Jesus Discua's *motor vehicle* with the intent to deprive him of the property, and "during the course of the commission of the offense," discharging a firearm, resulting in death or great bodily harm. [ECF 13-3, p. 2] (emphasis added). The indictment also charged Petitioner with armed robbery (Count 4) for acting in concert with his co-defendants to "unlawfully, by force, violence, assault or putting in fear," take "*cocaine and/or U.S. coin or currency and/or a wallet and/or an automobile and/or belongings*," of Discua with the intent to deprive him of his property and "during the course of the commission of the offense," discharging a firearm, resulting in death or great bodily harm. [*Id.* p. 3] (emphasis added).

In closing, the prosecutor explained the State's theory for each charge. Regarding the carjacking count, the prosecutor explained that State's theory was based on Petitioner taking the Audi after using a firearm. [T. 35, pp. 3984-85]. The theory for the armed robbery count was not that Petitioner took the Audi, but that he

took cocaine and/or money from Discua's Nissan 350-Z through the use of force. [T. 35, pp. 3986-87].

While both Counts (2 and 4) involved the same victim, they occurred at separate locations. The armed carjacking of the Audi occurred at the BP gas station, where the crime originated. [T. 30, pp. 3320-21, 3229]. The armed robbery of Discua's cocaine and/or money occurred at his home, where his Nissan 350-Z that held the cocaine was stored. [T. 23, pp. 2298, 2424; T. 24, p. 2493; T. 31, p. 3530]. There was also a temporal break between the incidents, with Discua making a phone call to his family in between the carjacking and the robbery. [T. 23, p. 2420]. Thus, Petitioner's separate convictions for these different offenses arising from the same general incident do not violate the Double Jeopardy Clause. *See* Fla. Stat. § 775.021(4)(a),(b).

Moreover, the Florida Supreme Court has specifically held that the Florida legislature intended to authorize separate punishments for carjacking and robbery when the property stolen in the robbery is something other than the vehicle stolen in the carjacking. *See Cruller v. State*, 808 So.2d 201, 203-04 (Fla. 2002). *See also Brown v. Sec'y, Dep't of Corr.*, No. 8:07-CV-1304-T-30MAP, 2009 WL 320860, at *5 (M.D. Fla. Feb. 9, 2009); *Allen v. McDonough*, No. 05-23160-Civ-JORDAN, 2007 WL 9770254, at *19 (S.D. Fla. Sept. 18, 2007). Here, as previously discussed,

the property in the robbery was drugs or money, not a vehicle. [T. 35, p. 3986-87]. Thus, Petitioner was not twice punished for the same criminal conduct.

Similarly, Counts 5 and 6 each charged Petitioner with grand theft of a vehicle. [ECF 13-3]. Evidence was presented to suggest that Petitioner was a criminal actor in the stealing of both the Audi and the Nissan 350-Z. [T. 23, pp. 2288, 2385-86, 2289]. Bost cars were stolen, but at different times, places and under different circumstances. Plus, count 5 was later dismissed by the State. As such, there is no double jeopardy issue regarding these two counts.

To the extent that Petitioner means to argue that Count 2 (armed carjacking) and Count 6 (grand theft auto of the Nissan 350-Z) violate double jeopardy, such a claim is without merit. Petitioner was charged with carjacking the Audi from the gas station, not the Nissan 350-Z. Moreover, regarding Count 4 (armed robbery) and Count 6 (grand theft of the 350-Z), these counts do not violate double jeopardy because, as previously discussed, the Petitioner was charged with stealing drugs and/or money from Discua regarding the armed robbery count. The 350-Z was also stolen. These convictions do not violate the double jeopardy clause. *See Cruller v. State*, 808 So.2d 201, 203-04 (Fla. 2002).

The only possible two counts that may have possibly created a double jeopardy violation are Petitioner's convictions for armed carjacking of the Audi (Count 2) and grand theft of the Audi (Count 5), because grand theft of the Audi is

46

subsumed by the carjacking. However, since Count 5 was dismissed by the State, there is no double jeopardy issue. *Pizzo v. State*, 945 So.2d 1203, 1206 (Fla. 2006).

Given the foregoing, counsel cannot be deemed deficient for failing to move to dismiss the indictment on double jeopardy grounds under the first prong of *Strickland* because none of the counts, with the exception of Counts 2 and 5, twice charged Petitioner for the same criminal conduct.

Moreover, even when assuming that counsel was deficient for failing to move to dismiss Counts 2 and/or 5 from the indictment prior to trial, Petitioner fails to articulate any deficiency resulting from this prejudice. Petitioner's conviction on count 5 was dismissed, and he is not serving a sentence on that count. Because Petitioner fails to satisfy both prongs of *Strickland*, his claim should be denied.

In **claim 3**, Petitioner alleges that counsel was ineffective when he failed to move to dismiss the armed trafficking charge at the end of the state's case in chief. [ECF 1, p. 8]. Specifically, he claims that none of the witnesses actually saw the cocaine that was alleged taken from Discua. [*Id*.]. Huerta testified that Petitioner offered him a package, which he believed was a kilo of cocaine, but, he did not know what was in the package. [*Id*.]. Petitioner further claims that had counsel properly impeached Huerta to show reasonable doubt as to whether cocaine over the amount to traffic actually existed, the trial court would have granted his motion for judgment of acquittal on the armed trafficking count. [*Id*.].

The Respondent disputes the exhaustion of this claim. [ECF 11, pp. 60-63]. However, because the procedural bar issues associated with this claim are complicated, the Court will evaluate Petitioner's claim under *de novo* review standard. *See, e.g., Berghuis v. Thompkins*, 560 U.S. at 390.

The decision to cross-examine a witness and the manner in which it is conducted are tactical decisions "well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). In order to establish prejudice, a habeas petitioner must show at least one "specific instance where cross-examination arguably could have affected the outcome . . . of the trial." *Id. (*quoting *Messer*, 760 F.2d at 1090).

Here, review of the record reveals that counsel extensively and aggressively cross-examined Huerta at trial. [T. 33, pp. 3718-3765]. In pertinent part, trial counsel questioned Huerta about the package that Petitioner retrieved from Stubbs after the murder as follows:

> Q.  You talked about Michael Paul coming out of the house that you – that Travis Stubbs was at with some sort of package, right?
> A.  Yes.
> Q.  And what kind of package was it?
> A.  A brown paper bag.
> Q.  And when you got – and you went to Haney's Bezada's father's efficiency?
> A.  Yes.
> Q.  Did you open the paper bag?
> A.  No.
> Q.  And what was in the paper bag?

A.     I never seen him take anything out of the paper bag. I'd seen him go into the bathroom with the paper bag and when he came out I had seen what he had in his hand.

Q.     And what ddi [sic] he have in his hand?

A.     It appeared to be a kilo.

Q.     How could you tell it was a kilo?

A.     That's what it appeared to look like. That's what it looked like.

Q.     Well, how did it look exactly?

A.     A square size. Maybe that thin (indicating). That thick (indicating). It was wrapped in what looked like to be a kilo.

Q.     What was it wrapped in?

A.     It was white wrapping. *I don't know what was inside*. It could have been rubber. I didn't get that far.

Q.     Did you ever tell anybody the kilo was wrapped in saran wrap?

A.     Yes.

Q.     Who did you tell that to?

A.     I don't remember. But that's what it was wrapped in.

Q.     You said it was white?

A.     Well – if you wrap it enough times it looks white.

[T. 33, pp. 3765-66] (emphasis added). Trial counsel also impeached Huerta as testifying to save himself. [T. 33, p. 3762].

At the close of the state's case, counsel moved for a judgment of acquittal, specifically arguing that there was no cocaine presented in evidence. [ECF 14-35, p. 3929]. As such, counsel argued that the state failed to present a p*rima facie* case of drug trafficking [T. 35, p. 3930]. The trial court denied the motion, finding that the facts of the case were for the jury to determine. [T. 35, p. 3931]. In closing argument, counsel thoroughly argued that Huerta was not a reliable witness because he was a four-time convicted felon who made a plea agreement with the state and had an obvious motive to lie on the stand. [T. 35, pp. 4014-15].

49

The record above demonstrates that counsel conducted a thorough examination of Huerta, getting him to admit that he did not know that the item that was inside the paper bag was cocaine, and ultimately harping on this fact during his motion for judgment of acquittal. Petitioner fails to identify what other questions counsel should have asked or what other actions counsel could have taken regarding Huerta's cross-examination that would have resulted in a different outcome at trial. Such conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Smith v. White,* 815 F.2d at 1406–07.

However, even assuming that counsel was deficient for failing to sufficiently cross-examine Huerta, Petitioner fails to demonstrate that he suffered any prejudice. Under Florida law, courts do not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. *Lynch v. State*, 293 So.2d 44, 45 (Fla. 1974). Even if counsel had more thoroughly impeached Huerta on his lack of knowledge regarding the amount and type of the substance or item inside of the paper bag, there is no reasonable likelihood that the trial court would have granted counsel's motion for judgment of acquittal. This is so because there was overwhelming evidence presented at trial to show that Petitioner engaged in the crimes as charged such that a reasonable juror could have found him guilty beyond a reasonable doubt, including Petitioner's own admission to police that he went to

50

look for Stubbs after the incident to get his share of the cocaine recovered. [T. 27, pp. 2984-85]. Because Petitioner fails to successfully prove either prong of *Strickland*, his ineffective assistance of counsel claim fails and should be denied.

In **claim 4**, Petitioner asserts that counsel was ineffective when he failed to produce evidence to support an independent act instruction. [ECF 1, p. 9]. Specifically, Petitioner argues that he would have testified that he only planned to rob Discua of his cocaine, that he did not shoot Discua, and that he was afraid of Stubbs. [*Id.*]. Petitioner also claims that counsel could have obtained testimony from Myron Morales or Rudolph Sawyer to provide a basis for an independent act instruction. [*Id.* p. 10]. Petitioner claims that this ground is exhausted because it was raised in his Rule 3.850 appeal. [*Id.*].

As discussed in claim 1, the Respondent correctly concedes that Petitioner properly exhausted his claim that his *own testimony* would have supported an independent act instruction, and the merits of that claim were addressed above. However, the Respondent argues here that Petitioner's claim that counsel could have presented the testimony of Morales and Sawyer to support an independent act instruction was not properly exhausted.

Review of the record reveals that Petitioner raised this particular claim as ground eleven in his Rule 3.850 motion for postconviction relief. [ECF 13-32, p. 30]. The trial court denied the claim on the merits. [ECF 13-36, pp. 10-11]. Appellate

counsel, however, did not raise this issue when she filed the *Anders* brief. [ECF 13-48]. Petitioner filed his own brief, alleging that the trial court erred by denying his claim that counsel was ineffective for misadvising him not to testify where *his testimony* would have supported an independent act instruction. [ECF 13-52, pp. 10-14]. He did not, however, argue that the trial court erred by denying his claim that counsel should have presented the *testimony of other witnesses* in support of an independent act instruction. [ECF 13-52, pp. 19-22]. As such, claim 4 is unexhausted as it was not presented on appeal. *Castille v. Peoples,* 489 U.S. at 351. Moreover, claim 4 would now be procedurally barred if raised in state forum because Petitioner has already completed a direct appeal and a Rule 3.850 motion. *Bailey v. Nagle,* 172 F.3d at 1302-03.

Here, Petitioner makes no showing of cause and prejudice to excuse the procedural default of claim 4 raised in the instant petition. To the extent that Petitioner means to allege, in objections or otherwise, that he can rely on *Martinez v. Ryan* to circumvent the procedural default of his claim, such a claim is without merit. *Martinez* does not apply to appeals of collateral proceedings in state court. *See Baker v. Dep't of Corr.*, 634 F. App'x 689, 693 (11th Cir. 2015) (citing *Martinez*, 566 U.S. at 16). Given the foregoing, claim 4 is procedurally defaulted from federal review.

Even if this claim was properly exhausted, Petitioner fails to explain in any detail how Morales or Sawyer's testimony would have been beneficial to his defense. There is nothing in the record to suggest that these witnesses would have testified to facts consistent with Petitioner's "independent act" theory. In fact, Morales testified at trial that he saw Petitioner holding a firearm during the incident. [T. 30, p. 3364]. Such bare and conclusory claims of ineffective assistance are subject to dismissal. *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d at 1333–34.

Moreover, to the extent that Petitioner means to argue that counsel failed to effectively cross-examine Morales at trial, such a claim is also without merit. Review of the record reveals that counsel extensively cross-examined Morales, focusing on his obvious motive to minimize his role in the crime in order to save himself from a serious prison sentence. [T. 30, pp. 3325-63]. Counsel also thoroughly cross-examined Morales on his statements made in deposition, which were inconsistent with his testimony at trial [T. 30, pp. 3337-39], and got Morales to admit that he never really saw what was going on inside of the car at the gas station. [T. 30, p. 3346]. These tactical decisions that counsel made regarding the manner of cross-examining Morales were well within his discretion, and Petitioner failed to identify one specific instance where a different cross-examination could have affected the outcome at trial. *See Fugate v. Head*, 261 F.3d at 1219 (citing *Messer v. Kemp*, 760 F.2d at 1090).

53

Finally, regarding Rudolph Sawyer's testimony, Petitioner fails to identify any specific instance where counsel's cross-examination at trial was insufficient. Sawyer, whose sister has children with Stubbs [T. 30, p. 3401], testified at trial that on the night of the incident, he saw a red Audi and a Nissan 350-Z in a parking lot, with eight black men standing outside the cars, including Stubbs. [T. 31, p. 3410-14]. Sawyer testified that Stubbs told him that there was a man tied up in the back seat of the Audi, who had died. [T. 31, pp. 3414, 3418]. After Stubbs's counsel extensively cross-examined Sawyer, Petitioner's counsel indicated that he had no cross-examination questions for this witness. [T. 31, p. 3435]. Sawyer's testimony did not implicate Petitioner because Petitioner was not present at the time that Sawyer encountered Stubbs on the night of the incident. As such, it was not ineffective for counsel to decline to cross-examine him. Petitioner fails to demonstrate any specific instance where Sawyer could have given testimony that would have supported an independent act instruction. Accordingly, Petitioner's ineffectiveness claim fails.

Given the foregoing, claim 4 should be denied.

### VIII. Cautionary Instruction Re: Clisby Rule

The Court is mindful of the *Clisby* rule that requires district courts to address and resolve all claims raised in habeas corpus proceedings, regardless of whether relief is granted or denied. *Clisby v. Jones*, 960 F.2d at 936-36; *Rhode v. United*

*States,* 583 F.3d 1289, 1291 (11th Cir. 2009) (holding that *Clisby* applies to § 2255 proceedings). However, nothing in *Clisby* requires consideration of claims or arguments raised for the first time in objections. If the Petitioner attempts to raise arguments or further factual support for his claims in objections, the court should exercise its broad discretion and refuse to consider the arguments not raised before the magistrate judge in the first instance. *See Williams v. McNeil,* 557 F.3d 1287 (11th Cir. 2009) (*citing Stephens v. Tolbert,* 471 F.3d 1173, 1175 (11th Cir. 2006) (finding no abuse of discretion by the district court in declining to consider timeliness argument that was not presented to the magistrate judge)). This is so because "[P]arties must take before the magistrate, 'not only their best shot but all of the shots.'" *See Borden v. Sec'y of Health & Human Services*, 836 F.2d 4, 6 (1st Cir. 1987) (*quoting Singh v. Superintending School Committee of City of Portland*, 593 F. Supp. 1315, 1318 (D. Me. Sept. 27, 1984).

## IX. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th

Cir. 2016), *cert. den'd*, 137 S. Ct. 2245 (2017). The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing is not warranted here.

## X. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the Petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Upon consideration of the record, this court should deny a certificate of

appealability. Notwithstanding, if Petitioner does not agree, he may bring this argument to the attention of the District Judge in objections.

## XI. Conclusion

Based upon the foregoing, it is recommended that:

1.      the federal habeas petition be DENIED on the merits;

2.      final judgment be entered in favor of Respondent;

2.      a certificate of appealability be DENIED; and,

3.      the case CLOSED.

Objections to this report may be filed with the District Court within fourteen days of receipt of a copy of the report. Failure to file timely objections shall bar Petitioner from a *de novo* determination by the District Court Judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the District Court Judge, except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

Signed this 6th day of January, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

cc:    Michael Paul

M40318
Hardee Correctional Institution
Inmate Mail/Parcels
6901 State Road 62
Bowling Green, FL 33834
PRO SE

Gabrielle Raemy Charest-Turken
Office of Attorney General
Department of Legal Affairs
SunTrust International Center
One SE Third Avenue
Suite 900
Miami, FL 33131
(305) 377-5441
Fax: (305) 377-5655
Email: Gabrielle.CharestTurken@myfloridalegal.com